**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CASE NO. 21-CR-523-TNM** |
| **ELIAS ELDABBAGH,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through the undersigned counsel, respectfully submits its Memorandum in Aid of Sentencing. As described herein, the Defendant has committed a deplorable crime by seeking to exploit a once-in-a-century global health crisis for his own greed. The Defendant filed 29 fraudulent applications claiming more than $31 million in Paycheck Protection Program ("PPP") loans and Economic Injury Disaster Loan ("EIDL") funds, resulting in the theft of $2,385,000 from these two critical federal programs designed to address the worst economic impacts of the COVID-19 pandemic. To execute his fraud, the Defendant used numerous stolen identities and stolen tax returns and financial records from a legitimate company. The Defendant then laundered the proceeds of his fraud through more than a dozen bank accounts as well as crypto-currency – executing more than 9,000 transactions in at least 43 different cryptocurrencies. The Defendant used the stolen relief funds to make speculative financial investments and to buy a Tesla and pay personal expenses such as rent, dog boarding, food, ride shares, attorney's fees electronics and clothing from boutique clothing stores. The Defendant treated the PPP and EIDL programs as his personal piggy bank. His frauds showed a shocking level of greed and disregard for the purpose of these funds, allocated for the most vulnerable Americans and to ameliorate the devastating economic impacts of the COVID-19 pandemic.

The Defendant pleaded guilty on April 8, 2022, to one count of wire fraud in violation of

18 U.S.C. § 1343 and one count of engaging in monetary transactions in criminally derived funds, commonly known as expenditure money laundering, in violation of 18 U.S.C. § 1957. By plea agreement, the parties agreed that the final offense level is 31, resulting in a guidelines range of 135 to 168 months' imprisonment. Plea Agreement ¶ 5. The United States Probation Office disagreed with the parties' Guidelines' calculations and calculated the offense level to be 34, PSR ¶ 82, and the advisory guidelines range to be 188 to 235 months' imprisonment, PSR ¶ 170. Based on the foregoing, the government respectfully requests that the Court sentence the Defendant to a sentence of 168 months' incarceration at the high end of the parties agreed-upon Guidelines range, three years of supervised release, restitution in the amount of $2,452,050, and a forfeiture money judgment.

## I.      The Defendant's PPP and EIDL Fraud

### a.   Background of the PPP and EIDL programs

In March 2020, the CARES Act authorized billions in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). Qualifying businesses with certain payroll expenses could obtain forgivable PPP loans to be used by the business for permissible expenses—payroll costs, interest on mortgages, rent, and utilities. Later legislation permitted borrowers to take a "second draw" PPP loan under the same general terms. Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations.

An Economic Injury Disaster Loan ("EIDL") is an SBA-administered loan designed to assist small businesses that suffered substantial economic injury as a result of a declared disaster.

The EIDL application process collected information concerning the business and the business owner, including information as to the gross revenues for the 12 months prior to the disaster; the cost of goods sold; and information as to any criminal history of the business owner.

Both programs are described in detail in the Statement of Offense, ¶¶ 16-23.

### b. The Fraud Scheme

Alias Systems, LLC, was a Virginia limited liability company ("LLC") formed by the Defendant on August 31, 2018, and controlled entirely by the Defendant. Alias Systems, LLC had no other employees, no office-space, and its sole corporate bank account appeared to receive no revenue.

From July 2020 through May 2021, the Defendant filed at least 25 fraudulent PPP loan applications in the name of Alias Systems, LLC seeking $30,430,230 in PPP loan funds and at least four EIDL applications seeking $950,000 in EIDL funds. *See* Statement of Offense ¶ 27. These applications were entirely false, and the vast majority of the applications were made using the stolen identity of C.S. as the purported owner of Alias Systems, LLC. The Defendant has admitted to stealing the identification card and social security card of C.S. – a prior friend of the Defendant's – when C.S. was living with the Defendant. *Id.* at ¶ 25. In addition to the fraudulent use of C.S.'s name and social security number, the Defendant provided a photo of C.S.'s identification card – also previously stolen from C.S. – to the lenders. In these applications, the Defendant falsely claimed that Alias Systems, LLC had 49 employees and large monthly payroll. The amounts varied, slightly, by application, but included claims, for example, that Alias Systems, LLC had 49 employees and $648,000 in monthly payroll (Second Draw ReadyCap application). In support of these fraudulent applications, the Defendant used tax returns and payroll records

3

stolen from COMPANY 1, a legitimate Washington, DC based consulting firm, and doctored them to *appear* to be the tax returns and payroll records of Alias Systems, LLC. The Defendant has admitted to stealing corporate income tax, employment tax, and other sensitive corporate documents from COMPANY 1. *Id.* at ¶ 25. The exact mechanism by which the Defendant stole these sensitive financial documents is still unknown.

### c.  Total Intended Loss

In total, the Defendant attempted to steal more than $31 million. *Id.* ¶ 25.

| DATE | TYPE | NAME | LENDER | LOAN AMOUNT |
|---|---|---|---|---|
| 7/4/2020 | PPP | Alias Systems, LLC | Cross River Bank | $   823,958.33 |
| 7/15/2020 | PPP | Elias Eldabbagh | US Bank | $   98,958.00 |
| 7/19/2020 | PPP | Alias Systems, LLC | US Bank | $   989,583.00 |
| 7/27/2020 | PPP | Alias Systems, LLC | Cross River Bank | $   957,292.00 |
| 7/29/2020 | EIDL | Alias Systems LLC | SBA | $   500,000.00 |
| 7/29/2020 | PPP | Alias Systems, LLC | Funding Circle | $   1,125,000.00 |
| 7/30/2020 | EIDL | Vicker | SBA | $   150,000.00 |
| 7/30/2020 | EIDL | Kyle Dunbar | SBA | $   150,000.00 |
| 7/30/2020 | PPP | Alias Systems, LLC | BlueVine (Fundera) | $   1,132,083.54 |
| 8/3/2020 | PPP | Alias Systems, LLC | Sandy Spring Bank | $   1,241,632.50 |
| 8/8/2020 | PPP | Elias Eldabbagh | BlueVine (BFNYC) | $   1,075,020.21 |
| 1/18/2021 | EIDL | Elias Eldabbagh | SBA | $   150,000.00 |
| 1/21/2021 | PPP | Alias Systems, LLC | WebBank via PayPal | $   937,500.00 |
| 1/24/2021 | PPP | Alias Systems, LLC | Cross River Bank | $   1,033,956.00 |
| 1/27/2021 | PPP | Alias Systems, LLC | Lendio, Inc. | $   1,170,000.00 |
| 1/27/2021 | PPP | Alias Systems, LLC | ReadyCap Lending , LLC | $   1,170,000.00 |
| 1/28/2021 | PPP | Alias Systems, LLC | Harvest Small Business Finance, LLC | $   1,170,000.00 |
| 2/4/2021 | PPP | Alias Systems, LLC | First Bank of the Lake | $   1,595,091.41 |
| 2/5/2021 | PPP | Alias Systems, LLC | Newtek Small Business Finance, LLC | $   1,120,000.00 |
| 2/8/2021 | PPP | Alias Systems, LLC | Zions Bank | $   1,710,425.00 |
| 2/8/2021 | PPP | Alias Systems, LLC | BlueVine | $   1,022,249.48 |
| 2/17/2021 | PPP | Alias Systems, LLC | US Bank | $   1,750,000.00 |
| 2/26/2021 | PPP | Alias Systems, LLC | ReadyCap Lending , LLC | $   1,115,000.00 |

| 3/1/2021 | PPP | Alias Systems, LLC | ReadyCap Lending , LLC | $ | 1,620,000.00 |
| 3/11/2021 | PPP | Alias Systems, LLC | US Bank | $ | 1,640,000.00 |
| 3/13/2021 | PPP | Alias Systems, LLC | TD Bank | $ | 1,620,000.00 |
| 3/18/2021 | PPP | Alias Systems, LLC | Itria Ventures, LLC (BIZ2Credit) | $ | 1,854,165.00 |
| 4/23/2021 | PPP | Alias Systems, LLC | ReadyCap Lending , LLC | $ | 1,020,817.00 |
| 5/17/2021 | PPP | Alias Systems, LLC | Itria Ventures, LLC (BIZ2Credit) | $ | 1,437,499.00 |
| | | | | **$** | **31,380,230.47** |

### d.  Total Loss

The Defendant's fraudulent applications resulted in the actual loss of $2,385,000, comprised of two fraudulently issued PPP loans in the name of Alias Systems, LLC and a fraudulent issued $150,000 EIDL in the name of Alias Systems, LLC.

| DATE | TYPE | NAME | LENDER | AMOUNT |
|---|---|---|---|---|
| 7/29/20 | EIDL | Alias Systems, LLC | SBA | $150,000.00 |
| 2/5/21 | PPP | Alias Systems, LLC | Newtek Small Business Finance, LLC | $1,120,000.00 |
| 2/26/21 | PPP | Alias Systems, LLC | ReadyCap Lending , LLC | $1,115,000.00 |
| | | | | **$2,385,000.00** |

Additionally, the SBA paid lenders fees to Newtek of $33,600 and to ReadyCap in the amount of $33,450. The Defendant did not receive these amounts directly, but they are included in the restitution calculation *infra.*

### e.  Efforts to Prevent Seizure

On May 25, 2021, IRS-CI agents executed a search warrant on the Defendant's residence and served seizure warrants for 18 bank accounts containing proceeds of the fraud.[1] The Defendant was provided copies of those seizure warrants. In other words, he was well aware that

---

[1] *See* 21-sz-4 (seizure warrant for US Bank); 21-sz-5 (seizure warrant for E*Trade); 21-sz-6 (seizure warrant for Morgan Stanley); 21-sz-7 (seizure warrant for SoFi); 21-sz-8 (seizure warrant for WeBull); 21-sz-9 (seizure warrant for Robinhood); 21-sz-10 (seizure warrant for CitiBank); 21-sz-11 (seizure warrant for PrimeTrust); 21-sz-12 (follow-on seizure warrant for SoFi).

those accounts had been lawfully seized. Nonetheless, following the search warrant executed on May 25, 2021, the Defendant made dozens of calls to E*Trade, attempting multiple methods of transferring funds from his seized E*Trade accounts including adding a joint owner and initiating ACAT transfers. The Defendant successfully initiated purchases on his Morgan Stanley debit cards, on or about May 26, 2021, knowing that those purchases would be drawn on a seized account. Finally, the Defendant successfully initiated and caused a transfer on May 27, 2021, of securities from his seized Webull account to a financial account that was *not* seized by IRS-CI. The Defendant has agreed, by plea agreement, that this conduct constitutes obstruction within the meaning of U.S.S.G. § 3C1.1

### f.   Disposition and Laundering of the Proceeds

After successfully stealing $2,375,000 in PPP and EIDL funds, the Defendant engaged in a truly dizzying array of financial transactions. After fraudulently receiving the PPP loans into a US Bank account in the name of Alias Systems, the Defendant distributed the fraud proceeds to multiple accounts at US Bank, E*Trade Morgan Stanley, CitiBank, Robinhood, SoFi, Webull, PrimeTrust, and later TastyWorks.



The fraudulently obtained $150,000 EIDL was used to purchase a $68,129 2020 Tesla Model 3 and to further fund the Defendant's Robinhood accounts.



*2020 Tesla Model 3 purchased with fraud proceeds*

The Defendant used the fraud proceeds to invest in speculative stock options and to fund purchases of cryptocurrency. The Defendant converted $185,550 of fraud proceeds into cryptocurrency through Binance, using the proceeds to conduct over 7,450 transactions involving at least 26 different cryptocurrencies. *See* Statement of Offense ¶ 32. The Defendant converted another $92,367 of fraud proceeds into cryptocurrency using Crypto.com, using the proceeds to conduct over 2,000 transactions involving at least 43 different cryptocurrencies. *Id.* at ¶ 33. In addition to the speculative cryptocurrency trading, the defendant used a linked crypto debit card to purchase rent, hotels, dog boarding, attorney fees, food, ride shares, electronics, and other personal expenses. *Id.*

Additional fraud proceeds were traced to the following purchases including thousands of dollars of payments in "P2P" transfers to third parties, home expenses, electronics, furniture, clothing, and travel expenses.

| P2P (Cash App, Zelle etc.) | $ 26,381.63 |
| Best Buy | $ 25,182.96 |
| Home Depot | $ 21,157.09 |
| Walmart | $ 19,213.64 |
| Rental Payments | $ 13,953.00 |
| Razer.com | $ 12,169.77 |
| eBay | $ 11,747.94 |
| Apple | $ 4,274.46 |
| Sofa Mania | $ 4,262.00 |
| Microsoft | $ 3,710.00 |
| Nasty Pig | $ 3,508.61 |
| Timoteo | $ 2,527.93 |
| Samsung | $ 2,279.00 |
| UBIQUITI INC. | $ 1,800.00 |
| Marriott | $ 1,250.00 |
| Extra Space | $ 1,202.04 |
| Rental Car Companies | $ 669.03 |
| Residence Inn | $ 517.78 |

| UHaul | $ 410.00 |
|---|---|
| Tobacco King and Vape | $ 174.87 |
| Uber/Uber Eats/Lyft | $ 129.38 |

## II.    Other Fraud Schemes

In addition to the Defendant's $31 million scheme to defraud the PPP and EIDL programs, the government's investigation uncovered a multitude of additional fraud schemes perpetrated by this Defendant. The Defendant objects to the inclusion of the following information in the PSR because it is not "relevant conduct," citing to U.S.S.G. § 1B1.3(a)(1)(A) and *United States v. McCants*, 554 F.3d 155, 162 n.4 (D.C. Cir. 2009). The Defendant misapprehends the basis for the Court's appropriate consideration of this information. Section 1B1.3 of the Guidelines relates to information used to calculate the Guidelines offense level. The government is not requesting that the Court use the Defendant's other fraud schemes in the calculation of the Defendant's Guidelines range. Rather, the government proffers the following information regarding the Defendant's uncharged fraud schemes for the Court's consideration at sentencing. Both the Guidelines and statute explicitly recognize that the Court is not limited in the information it may receive at sentencing. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Citing this statute, the Guidelines also direct that:

> In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.

U.S.S.G. § 1B1.4.

9

The Court may properly consider the uncharged fraud schemes described below at sentencing. The scope and breadth of the Defendant's continuous frauds support a guidelines sentence at the top of the guideline range, consistent with Section 1B1.4's mandate that any information concerning the conduct of the defendant may be considered in determining the sentence to impose within the guideline range.

### a.  Unemployment Fraud

From approximately March 2020 until at least May 2021, the Defendant used his own personal identifying information and at least two stolen identities to orchestrate a scheme to defraud at least five state employment agencies out of at least $173,931.00 of unemployment insurance (UI) and Pandemic Unemployment Assistance (PUA) funds.  In addition to the fraudulent UI and PUA applications, the Defendant advised at least one other associate on how to fraudulently apply for UI and PUA benefits.

### i.  Fraudulent Applications in the Name of Eldabbagh

The Defendant used his own personal information to submit applications for UI benefits to at least five different state employment agencies and received approximately $126,088.00 in UI benefits. Approximately $101,656.00 of these benefits were fraudulently obtained.

The Defendant was well aware that he could only lawfully claim UI benefits from one state. During the application for UI benefits from the Virginia Employment Commission (VEC), likely the only legitimate application the Defendant completed, the Defendant certified that he acknowledged that he could only submit an application for UI benefits to one state. Notwithstanding his acknowledgment of this warning, the Defendant proceeded to file initial UI applications, ongoing PUA applications or receive benefits from the District of Columbia (DC),

Maryland (MD), New York (NY) and Massachusetts (MA). The total amounts below do not include unemployment assistance received from Virginia.

| FRAUDULENT ELDABBAGH UI APPLICATIONS ||
| State | Benefit Amount |
|---|---|
| DC | $17,549.00 |
| NY | $15,120.00 |
| MD | $30,100.00 |
| MA | $38,887.00 |
| **Total** | **$101,656.00** |

### ii.  Fraudulent Applications in Other Identities

In addition to the UI applications that the Defendant filed in his own name, the investigation revealed that the Defendant submitted UI applications in the names of two other associates without their consent. The Defendant filed at least three UI applications in the name of victim C.S. – in whose name the fraudulent PPP loan applications were filed – successfully stealing approximately $35,686.00 in benefits in the name of C.S. The Defendant stole C.S.'s personal information when C.S. lived with the Defendant for a short time. After that time, C.S. lived in Nevada and California. Since leaving Virginia, C.S. has not lived, worked or filed for UI benefits in DC, MD or VA. See ECF 30 (Statement of Offense) ¶ 24 (admitting to stealing C.S.'s identification card and social security card).

| FRAUDULENT C.S. UI APPLICATIONS ||
| State | Benefit Amount |
|---|---|
| MA | $0.00 |
| MD | $26,274.00 |
| VA | $9,412.00 |
| **Total** | **$35,686.00** |

The Defendant filed at least two UI applications in the name of associate N.A. and thereby

fraudulently obtained $36,589.00 in benefits in N.A.'s name. When interviewed, N.A. told agents that he did not authorize the Defendant to file for UI benefits using his name and that N.A. did not apply for UI benefits in MA or MD. During the execution of a search warrant, a MD UI debit card in the name of N.A. was found under the Defendant's bed. The investigation has also revealed that N.S. received unemployment benefits from D.C., which are not included in these totals.

| FRAUDULENT N.A. UI APPLICATIONS | |
|---|---|
| State | Benefit Amount |
| MA | $20,109.00 |
| MD | $16,480.00 |
| **Total** | **$36,589.00** |

### b. Bank Fraud while on Pretrial Release

Additionally, as this Court is aware, the Defendant committed an audacious attempt at bank fraud while on pretrial release. This offense and supporting evidence are described in detail in the Government's Motion for Revocation, ECF 20. Prior to the Defendant's arrest and arraignment on this matter, IRS-CI executed seizure warrants on 18 bank accounts containing more than $1 million of fraud proceeds from this scheme. After his arrest, the Defendant was released with extremely restrictive financial conditions. Nonetheless, just one month after arraignment in this case, the Defendant attempted to defraud CitiBank out of $230,000 by fraudulently claiming that a check that *he cashed and deposited into his own account* had actually been forged and thus the $230,000 stolen from him. The Defendant demanded the return of the $230,000. In reality, the Defendant had transferred that money from CitiBank to his own account at E*Trade, which was then seized in its entirety as fraud proceeds by IRS-CI. This brazen fraud on Citibank, committed while on pre-trial release for a $31 million fraud, is consistent with the Defendant's relentless history of theft and fraud.

### c. Possible Identity Theft

Over the course of the investigation, a wide range of evidence of possible identity theft was uncovered including the possession of access devices, other identifying documents, and the attempt, establishment and use of bank accounts opened in stolen identities. During the execution of a search warrant on the Defendant's residence, agents uncovered dozens of access devices[2] in various names other than the Defendant. The majority of these persons have not been interviewed and so it is unknown whether the Defendant was authorized to have possession of these materials.

In the residence, IRS-CI also discovered six access devices in the name of victim C.S., whose information the Defendant has admitted to stealing and using to execute the PPP and EIDL scheme. Redacted photos of six access devices in identity theft victim C.S.'s name are provided below. The Defendant was not authorized to have these access devices in C.S.'s name and these cards appear to be yet another extension of a vast scheme to defraud by misusing C.S.'s stolen identity.

---

[2] Underneath the bed in the Defendant's bedroom, agents found:
- Three access devices in the name of K.R.M.
- One access device in the name of M.J.H.
- Three access devices in the name of C.S.
- One access device in the name of A.J.
- Three access devices in the name of K.D; two of these were for payments of MD and DC UI payments
- Four access devices in the name of N.A; two of these were for payments of MD and DC UI payments
- Two access devices in the name of B.S.
- A copy of S.H.'s Virginia Driver's License and Social Security Card
- Three envelopes that have the names, dates of birth and social security numbers of N.A., C.S. and B.S. written on the face of the envelope
- Two ADP Earnings Statements for A.K.
- Form 1095-C (Employer Provided Health Insurance Coverage), in the name of D.A.

Elsewhere in the Defendant's bedroom, agents found:
- One access device in the name of S.H.
- Two access devices in the name of C.S.
- One access device in the name of J.M.S.
- Employment documents in the name of R.B. including Form I-9, TSP-1, and W-4










**d.  Fraudulent bank accounts in the name of victim C.S.**

In addition to unauthorized credit cards and PPP loans, the Defendant clearly opened at

least one bank account in C.S.'s name. A Robinhood account in C.S.'s name was opened in April

2019 with the Defendant's PO Box as the address. Later, C.S.'s driver's license was provided to

Robinhood. Finally, a phone was added to the account and linked to an IP address assigned to the

Defendant.

### e. R.S. Identity Theft

Victim R.S. is the founder of a Washington D.C. based consulting firm, which appears as COMPANY 1 in the Indictment and Statement of Offense. Tax returns and financial documents that were stolen from COMPANY 1 were doctored and used to perpetrate the PPP loan fraud. R.S. told investigators about a prior identity theft incident where an identity thief ordered an Apple – Pro Display XDR (approximate value of $5,133.79) using R.S.'s identity. The display was ordered from Best Buy with a delivery address of the mother of the Defendant's long-time romantic partner. A Prince Willian County police report was found on the Defendant's devices stating that the previously mentioned display was never delivered to the address. This police report claims that R.S. lives at the address, however this is the address of the Defendant's romantic partner's mother.

A review of browser history on the Defendant's seized devices revealed multiple searches for R.S.'s name and an attempt to access what appears to be R.S.'s company Microsoft Outlook email box. A review of digital evidence also revealed an invoice in the approximate amount $13,000.00 in the name of B&H Photo and Video. The invoice is dated 12/31/2019, credit card number is unknown, and the Defendant's former address is listed as the shipment address. The email address used for this order, included R.S.'s name and company. R.S. confirmed that that email account was not owned by him, nor is it an official email address. Finally, a picture of R.S.'s Maryland Drivers' license was found on the Defendant's devices.

In other words, the Defendant's fraudulent use of R.S.'s identity goes far beyond the use of R.S.'s company's tax and payroll records and includes credit card fraud in R.S.'s name. And, although the exact mechanism by which the Defendant obtained R.S.'s identifying information

and corporate records remains unknown, the Defendant has admitted that he stole the tax returns and corporate documents from R.S.'s company, COMPANY 1, which were then used to execute the PPP loan fraud.

### f.   PayPal Chargeback Fraud

On or about January 7, 2021, the Defendant fraudulently initiated a dispute with PayPal claiming that a dog, Blake, that he purchased from PuppySpot arrived in poor health and was significantly different than advertised PayPal experienced a loss of approximately $3,777.00 from the scheme. To support the claim that the dog was in poor health when he arrived, the Defendant created fake veterinary records in the name of "Dr. Rosenthal" claiming that the dog suffered from diarrhea, abdominal pain and was not in top health. This form was created from a readily available blank form that is downloadable from the internet. Evidence recovered from the Defendant's digital devices, shows that the device accessed the same blank form that was then submitted as purportedly legitimate veterinary records. The digital devices also reveal a search for the term "Dr. Rosenthal" on the same day the fraudulent forms were submitted to PayPal. The veterinary records claim to be signed by a Dr. Rosenthal on December 6, 2020, but contain no additional information about the veterinary practice, nor could investigators identify a Dr. Rosenthal practicing general veterinary medicine in D.C. Based on this fraudulent submission, PayPal initiated a chargeback, refunding the Defendant the $3,777 paid to PuppySpot for the dog, Blake.

## III.   Sentencing Guidelines

### a.   Guidelines Calculations

By plea agreement, the parties agreed that the defendant's total offense level was 34 and that after application of a three-point reduction for acceptance of responsibility, the Estimated

Offense Level would be at least 31 resulting in an estimated Guidelines range of 135 to 168 months' imprisonment. *See* Plea Agreement ¶ 5(A)-(C). The PSR writer disagreed with the parties' Guidelines analysis and found the Total Offense Level to be 34, resulting in a Guidelines range of 188 to 235 months' incarceration. *See* PSR at ¶¶ 68-82 (offense level calculation). Both calculations are set forth below.

### i. The Plea Agreement's Calculation

By plea agreement, the parties agreed to the following Guidelines calculation. Pursuant to Application Note 6 to U.S.S.G. § 2S1.1, because the defendant will be convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts are grouped pursuant to subsection (c) of §3D1.2 (Groups of Closely-Related Counts).

Count Five (Wire Fraud)

| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(K) | Intended loss greater than $9,500,000 | 20 |
| U.S.S.G. § 2B1.1(b)(10)(C) | Sophisticated means | 2 |
| U.S.S.G. § 2B1.1(b)(12) | Conduct described in 18 U.S.C. § 1040 | 2 |
| U.S.S.G. § 3C1.1 | Obstruction | 2 |
| | **Offense Level (Count Five)** | **33** |

Count Seven (Money Laundering)

| U.S.S.G. § 2S1.1(a) | Base Offense Level | 31[3] |
| U.S.S.G. § 2S1.1(b)(2)(A) | Convicted under 18 U.S.C. § 1957 | 1 |
| U.S.S.G. § 3C1.1 | Obstruction | 2 |
| | **Offense Level** | **34** |

---

[3]

| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(K) | Intended loss greater than $9,500,000 | 20 |
| U.S.S.G. § 2B1.1(b)(10)(C) | Sophisticated means | 2 |
| U.S.S.G. § 2B1.1(b)(12) | Conduct described in 18 U.S.C. § 1040 | 2 |
| | | **31** |

| U.S.S.G. § 3D1.2(c) | Final Combined Offense Level for Group | **34** | |
| U.S.S.G. § 3D1.3 | | | |
| | | | |
| U.S.S.G. § 3E1.1(a) | Acceptance of responsibility | -2 | |
| U.S.S.G. § 3E1.1(b) | Early acceptance of responsibility | <u>-1</u> | |
| | | | |
| | **Final Offense Level** | **31** | |

### ii.  The PSR's Calculation

The PSR's Guidelines calculation is set forth in paragraphs 68 to 82.

| U.S.S.G. § 2S1.1(a) | Base Offense Level | 34[4] | ¶ 73 |
| U.S.S.G. § 2S1.1(b)(2)(A) | Convicted under 18 U.S.C. § 1957 | 1 | ¶ 74 |
| U.S.S.G. § 3C1.1 | Obstruction | <u>2</u> | ¶ 77 |
| | | | |
| | **Adjusted Offense Level** | **37** | |
| | | | |
| U.S.S.G. § 3E1.1(a) | Acceptance of responsibility | -2 | ¶ 80 |
| U.S.S.G. § 3E1.1(b) | Early acceptance of responsibility | <u>-1</u> | ¶ 81 |
| | | | |
| | **Final Offense Level** | **34** | ¶ 82 |

### b.  Differences

The PSR's offense level calculation differs from the Parties' agreed-upon Guidelines calculation due to (1) the intended loss amount; (2) the interpretation of the cross reference from U.S.S.G. § 2S1.1 to § 2B1.1(a) to determine the base offense level; and (3) the PSR's imposition of a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) for the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of

---

[4] 

| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(L) | Intended loss greater than $25,000,000 | 22 |
| U.S.S.G. § 2B1.1(b)(10)(C) | Sophisticated means | 2 |
| U.S.S.G. § 2B1.1(b)(11)(C)(i) | Unauthorized transfer of means of identification | |
| | to produce another means of identification | 2 |
| U.S.S.G. § 2B1.1(b)(12) | Conduct described in 18 U.S.C. § 1040 | <u>2</u> |
| | | **34** |

18

identification. *See* PSR ¶¶ 73, 168. Each issue is addressed in turn.

### i. Loss Amount

By plea agreement, the parties agreed that the intended loss was between $9,500,000 and $25,000,000, resulting in a 20-level increase in offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(K). *See* Plea Agreement ¶ 5(A). By the time the Defendant entered his plea of guilty, the government had identified more than $31 million in fraudulent applications for PPP loans and EIDL funds. The Defendant admitted to the scope of his scheme in his statement of Offense. *See* Statement of Offense ¶ 26. Accordingly, the PSR found that the intended loss was more than $25 million and less than $54 million, resulting in a 22-level increase in offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(L). *See* PSR ¶¶ 73, 168.

As explained in footnote 2 of the plea agreement, and as stated on the record during the January 28, 2022, status conference, the government agreed to re-extend the basic terms of the original and then-expired November 24, 2021, plea offer after the Defendant stated that he had not received that plea offer. The extension of this plea offer was made to avoid any possibility of future litigation regarding whether the Defendant had been afforded all rights under *Missouri v. Frye*, 566 U.S. 134 (2012) (defense counsel has a duty to communicate formal plea offers) and *Lafler v. Cooper*, 566 U.S. 156 (2012) (remedy for counsel's ineffective assistance regarding plea offers was to order the State to reoffer the plea agreement). The government stated on the record that the investigation had since revealed that the intended loss was in excess of $25 million, which was inconsistent with the expired plea offer's intended loss amounts. Further, the February 16, 2022, cover letter accompanying the re-extended plea offer explicitly recognized the government's duty to truthfully account for the intended loss in this case. The Defendant has explicitly stated his

understanding that the government's duty to provide the Court and the U.S. Probation Office with the relevant facts including the intended loss and agreed that providing information to the Court and the U.S. Probation Office regarding the intended loss in this case did not constitute a violation of this plea offer. *See* Plea Agreement at 5 n. 2.

### ii.  Base Offense Level

The government disagrees with the base offense level calculated by the draft PSR for the grouped counts. The PSR states that the base offense level should be 6, pursuant to § 2B1.1(a)(2), but the government believes it should be 7, pursuant to § 2B1.1(a)(1).

The governing guideline for the grouped counts is § 2S1.1, for money laundering in violation of 18 U.S.C. § 1957. In order to determine the base offense level under § 2S1.1, § 2S1.1(a)(1) directs the Court to apply the "offense level for the underlying offense from which the laundered funds were derived," if the defendant is criminally responsible for the underlying offense and that offense level can be determined. Here, the underlying offense is wire fraud, for which the defendant is criminally responsible, and which is governed in turn by § 2B1.1. At this point, § 2B1.1(a)(1) and (a)(2) provides that the base offense level is either 7 if the defendant was convicted of an offense "referenced to this guideline" (§ 2B1.1) and that offense of conviction has a statutory maximum term of 20 years or more, or 6, if otherwise.

It is the undersigned's understanding that the United States Probation Office has taken the position that in these circumstances the relevant "offense of conviction," as referenced by § 2B1.1, is *money laundering*, not wire fraud, and money laundering in violation of 18 U.S.C. § 1957 is not

an "offense referenced to [§ 2B1.1]." Therefore, subsection (a)(1) does not apply, and the base offense level should be 6 pursuant to subsection (a)(2).[5]

The government respectfully disagrees with the United States Probation Office's interpretation of § 2B1.1(a)(1) and (a)(2) as they apply to this case. Instead, the government believes that the relevant "offense of conviction" should be wire fraud, and that subsection (a)(1) therefore applies, and the base offense level is 7.  First, this reading makes intuitive and logical sense. The money laundering guideline, § 2S1.1(a)(1), calls for a defendant who is criminally responsible for the underlying offense that generated the proceeds being laundered—such as wire fraud—to be punished as if the defendant were convicted of the underlying offense, by calculating the offense level for the underlying offense and applying it to the defendant. Then, § 2S1.1 applies certain enhancements for the defendant's *additional* criminal conduct in laundering the proceeds of his criminal activity. This is appropriate because money laundering offenses are often geared toward facilitating the underlying offense, making it harder to detect, making it more difficult to recover stolen proceeds, and so forth. Thus, in applying § 2S1.1(a) to calculate the offense level for a defendant who laundered the proceeds of wire fraud, it makes sense to calculate the wire fraud guideline as if the defendant had in fact been convicted of wire fraud. Because wire fraud in violation of 18 U.S.C. § 1343 is an offense punishable by up to 20 years in prison, and because § 1343 is referenced to § 2B1.1, the base offense level should be 7, pursuant to § 2B1.1(a)(1).[6]

---

[5] The government understands that the PSR's calculation is consistent with guidance issued by the staff of the U.S. Sentencing Commission.

[6] This is precisely what one would also expect under the Guidelines admonition to incorporate all "relevant conduct" in assessing the defendant's offense level, specific offense characteristics, cross references, and adjustments.  *See* U.S.S.G. § 1B1.3(a).

To hold otherwise would lead to absurd results. The PSR's reading would mean that laundering the proceeds of basic property crimes (calculated under § 2B1.1) is punished more lightly than laundering the proceeds of other crimes, because other guideline provisions do not have the same dual scheme set forth in § 2B1.1(a)(1) and (2). Here, it also obviates the +1 enhancement for a defendant convicted of a § 1957 offense (per § 2S1.1(b)(2)(A)) predicated on wire fraud, because the defendant also receives -1 discount in calculating the underlying offense level under § 2B1.1—leaving no additional penalty for the laundering conduct. In other words, a defendant who, as here, pleads guilty to both wire fraud in violation of § 1343 and expenditure money laundering in violation of § 1957 will have the same offense level as if he pleaded guilty solely to wire fraud. This cannot be what the Sentencing Commission intended.

Second, § 2B1.1(a)(1) applies under its literal terms here because the defendant *was* convicted of an offense referenced to § 2B1.1—namely, Count Five of the Indictment charging wire fraud.  Numerous cases have adopted this common-sense understanding.  *Compare United States v. Abdelsalam*, 311 F. App'x 832, 845 (6th Cir. 2009) (applying base offense level 6 where defendant was convicted of money laundering and receipt of stolen property, a 10-year offense); *with United States v. Nikolovski*, 565 F. App'x 397, 401-02 & n.4 (6th Cir. 2014) (clarifying that *Abdelsalam*'s holding that the proper base offense level was six was based on the ten-year statutory maximum penalty for violation of 18 U.S.C. § 2315); *see also United States v. Campbell*, 765 F.3d 1291, 1296 n.3 (11th Cir. 2014) ("Section 2S1.1(a)(1) provides that the base offense level for money laundering is the offense level of the underlying offense that produced the laundered money. Here, the underlying offense is the wire fraud and mail fraud charges, in violation of 18 U.S.C. §§ 1341 at 1343. The guideline section associated with those charges is § 2B1.1. Section

22

2B1.1(a)(1) provided Campbell's base offense level of 7."); *United States v. Salado*, 590 F. App'x

692, 693 (9th Cir. 2015) (applying base offense level 7 where defendant was convicted of § 1957

and also "was convicted of the underlying offenses of mail fraud and bank fraud, each punishable

by a statutory maximum term of imprisonment of twenty years or more").   Here, because the

defendant was convicted of *both* money laundering *and* wire fraud, § 2B1.1(a)(1) applies, and the

base offense level should be 7.

That is the approach recently adopted in this district by Chief Judge Howell in sentencing

a defendant convicted of both money laundering and bank fraud offenses:

> THE COURT: 2S1.1(a)(1) instructs that the base offense level for the underlying
> offense from which the laundered funds were derived, namely the bank fraud, and
> for which the defendant is convicted in Counts 1 and 2, is determined by 2B1.1.
> So, in this respect, 2S1.1(a)(1) sends the base offense level for the money
> laundering directly to 2B1.1.   2B1.1, in turn, provides that the base offense level
> for the defendant's underlying bank fraud should be 7 if the defendant was
> convicted of an offense referenced to this guideline and that offense of conviction
> has a statutory maximum term of imprisonment of 20 years or more; see the
> guideline at 2B1.1 (a)(1) -- or otherwise should be 6. See 2B1.1(a)(2), defendant's
> underlying bank fraud for which he was convicted and pleaded guilty to Counts 1
> and 2 of the superseding indictment is punishable by up to 30 years' imprisonment.
> See 18 U.S.C. Section 1344, and is referenced to Section 2B1.1 in Appendix A of
> the sentencing guidelines.   Thus, as the government contends, the plain text of the
> guideline dictates that the defendant's base offense level should be 7, not 6.
>
> Acting on the advice of staff apparently at the sentencing commission, the probation
> office, and the defense posit that the base offense level should be 6 since money
> laundering is not an offense referenced to this guideline.   While correct that money
> laundering is not referenced directly to 2B1.1 -- see Appendix A -- in this case, the
> defendant was convicted not only of money laundering conspiracy but also of the
> underlying bank fraud from which the laundered funds were proceeds and, in
> addition, the 2S1.1 money laundering guideline does refer for the base offense level
> -- that money laundering offense for a direct launderer -- to 2B1.1.   Thus, base
> offense level 7, at the guideline at 2B1.1(a), applies.

*United States v. Kelvin Otunyo*, D.D.C. No. 18-cr-251 (BAH), ECF No. 116 (Tr. of 8/13/21

Sentencing Hr'g), at 27:2-28:9.   Judge Bates recently adopted this position in *United States v.*

*Jamar Skeete*, 19-cr-414 (JDB) (April 8, 2022 sentencing hearing); ECF No. 43 (sealed Statement of Reasons).

The government respectfully submits that this approach is persuasive and consistent with the plain meaning of § 2B1.1(a)(1) as applied to this case.

### iii.   2B1.1(b)(11)(C)(i)

The Final PSR includes a two-level increase to the offense level pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i). PSR ¶ 73. Application Note 10(C)(ii) to Section 2B1.1 instructs, in part, that an example of conduct to which subsection (b)(11)(C)(i) applies is:

> A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.

This enhancement was not contemplated by the parties' agreed-upon calculations in the plea agreement. *See* Plea Agreement ¶ 5(A). Nonetheless the plea agreement explicitly states that the "parties also reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein." *See* Plea Agreement ¶ 7.

### c.    Criminal History and Guidelines Range

The PSR calculated four criminal history points resulting in a Criminal History Category of III. The government does not contest the PSR's criminal history calculation.

A total offense level of 31, as calculated by the parties' plea agreement, and a Criminal History Category of III results in an advisory Guidelines range of 135 to 168 months' imprisonment.

 A total offense level of 34, as calculated by the PSR, and a Criminal History Category of

III results in an advisory Guidelines range of 188 months to 235 months' imprisonment.

### IV.  The 18 U.S.C. § 3553(a) Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory.  However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-351 (2007). The § 3553(a) factors include, *inter alia*: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)-(7).

**A.    The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense**

The Defendant's offenses are egregious. He shamelessly looted government programs meant for people who otherwise stood to lose their jobs and their businesses as a result of the COVID-19 pandemic. The Defendant executed a vast and sophisticated scheme to rob the PPP and EIDL programs. Using corporate tax returns and financial documents stolen from COMPANY 1 and the identity of victim C.S. and COMPANY 1's employees, the Defendant created complex false documents to support his 29 false applications for government funds, attempting to steal over $31 million. He succeeded in stealing $2,385,000. The sheer number of false applications demonstrates that the defendant did not suffer from a momentary lapse of judgment, but instead made the deliberate choice to engage in a relentless pattern of fraud. The Defendant's scheme robbed emergency government relief programs that were designed to save businesses – and their employees – from the unprecedented economic impact of the COVID-19 pandemic. These programs were finite – in other words, by stealing PPP funds, the Defendant prevented other deserving people businesses from accessing desperately needed help. He did so out of sheer greed and with callous disregard to those who were actually suffering economic impacts from COVID-19. The gravity of the Defendant's offenses and the sophistication of his scheme supports a serious term of imprisonment, within the Guidelines range.

**B.    The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

A significant sentence of imprisonment here is necessary for both specific deterrence and general deterrence.

While the PPP program and COVID EIDL program have ended, it is critical that the Defendant's sentence serve as a deterrent to others who would rob government programs. Government program fraud is a deliberate and calculated crime of choice. It is therefore more susceptible to general deterrence and more in need of a significant sentence to achieve that deterrence. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). This type of crime is also difficult to detect and highly lucrative. This Defendant received $2,385,000 directly into his bank account, making this type of crime extremely attractive for would-be fraudsters, unless there is a significant fear of meaningful consequences. *See*, *e.g.*, *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

Of even more importance, here, is the need to deter this specific defendant from committing additional fraud. The Defendant is being sentenced today for a crime spree that included at least 29 fraudulent applications for government funds. Indeed, had the Defendant not been stopped by the diligent efforts of IRS-CI and the SBA-OIG, there is little doubt that he would be continuing to this day to file fraudulent applications to rob government programs. In fact, he filed his last fraudulent PPP application just seven days prior to the execution of a search warrant on his residence. As discussed *supra*, the government's investigation revealed that while this Defendant was executing his unrelenting fraud on the PPP and EIDL programs, he was also defrauding the Pandemic Unemployment Assistance program, engaging in credit card theft, additional identity

theft, and fraud on PayPal. Not even a 34-count Indictment and strict conditions of pre-trial release were enough to stop this Defendant from his inexorable drive to defraud – he was caught attempting to defraud Citibank out of $230,000 while on pre-trial release. This instant prosecution comes after a string of state theft and drug convictions for this Defendant, resulting in suspended sentencings, probation, and community service. Those contacts with the criminal justice system did nothing to deter the Defendant from the vast fraud that he now stands before the Court to be sentenced for. Accordingly, it is of the utmost importance that this Defendant be sentenced to a significant term of incarceration, in order to specifically deter him from this relentless course of fraudulent conduct.

### C.    The History and Characteristics of the Defendant

This Defendant has a lengthy criminal history consisting of a series of theft and drug offenses. *See* PSR ¶¶ 84-97. Further, while committing the instant vast PPP/EIDL fraud scheme, the Defendant was simultaneously committing unemployment insurance fraud, identity theft, credit card theft, and fraud on PayPal. *See* Section II Other Fraud Schemes, *supra.* Finally, the Defendant attempted to steal $230,000 from Citibank while on pre-trial release in this case. *See* Section II Other Fraud Schemes, *supra.* The Defendant's history of arrest and conviction, his conduct while on pre-trial release in this case, and his vast simultaneous frauds uncovered during this investigation demonstrate that this Defendant is an incorrigible fraudster, who has been completely undeterred, and perhaps even emboldened, by his prior contacts with the criminal justice system.

On November 1, 2018, the defendant was found guilty of theft under $1500. According to the PSR, the Defendant shop-lifted merchandise worth more than $2,000 from Target. *See* PSR at

¶ 85. When approached by loss prevention, a struggle ensued, and the defendant attempted to bite the loss prevention officer. The Defendant escaped and lost his phone. The police were then dispatched to the Target after the Defendant reported that he was the *victim* of a strong-arm robbery resulting in the theft of his cell phone. The Defendant was charged with 2nd Degree Assault, Theft over $1,500, False Statements, and Theft under $1,500. He pleaded guilty to Theft under $1,500 and he was sentenced to a suspended sentence and probation. The defendant was then arrested three different times while on probation in this matter. His probation was then terminated unsatisfactorily after he failed to provide verification that he completed the 24 hours of community service.

On April 23, 2019, the defendant was convicted of Unlawful Entry in Arlington, Virginia after shoplifting a Verizon phone and charger from Target. He was sentenced to a suspended sentence and 12 months of probation. *Id.* at ¶ 86.

On August 14, 2019, the defendant was found guilty of Trespass in Fairfax County, Virginia. According to the PSR, the defendant was arrested for attempting to shoplift multiple items from a Micro Center. *Id.* at ¶ 84. He was sentenced to community service and probation. He appears to have completed the terms of that sentence.

On November 22, 2019, the defendant was found guilty of Possessing Paraphernalia in Arlington County and was sentenced to a suspended sentence and 12 months' probation. *Id.* at 87.

On March 12, 2019, the defendant was found guilty of Trespass after stealing over $1,000 of items from an Apple store in McLean and attempting to steal from an Apple Store in Arlington. *Id.* at 88. In that case, police executed a search warrant and identified many items that could have

been stolen from Apple stores and evidence that the defendant was shipping a large number of items. The Defendant was sentenced to a suspended sentence and a fine.

The Defendant began the instant offense on or before July 4, 2020, when he filed the first false PPP application with Cross River Bank. *See* Statement of Offense ¶ 27. At that time, he was on probation for both the Arlington County Trespass conviction as well as the Arlington County Possession Paraphernalia conviction. *See* PSR ¶ 90.

In addition to the above convictions, the Defendant has a lengthy history of arrest.[7] On October 9, 2015, the Defendant was arrested for various drug charges in Queen Anne's County, MD. The case was placed on the stet docket. *See* PSR ¶ 93. On August 15, 2018, the Defendant was charged as a Fugitive from Justice in relation to his Montgomery County prosecution. That case was dismissed after the Defendant waived extradition. *Id.* at ¶ 94. On September 2, 2018, the Defendant was charged with Assault in Arlington County. *Id.* at ¶ 95. That case was dismissed. On March 12, 2019, the Defendant was charged with Shoplifting in Arlington County, and was found not guilty. No additional information is available regarding this case. *Id.* at ¶ 96. On March 28, 2020, the Defendant was arrested for Possession of Schedule I or II drugs in Arlington County. That case was nolle prossed. *Id.* at ¶ 97.

The Defendant describes his childhood as "quite good" and as an upper-middle class socio-economic upbringing. PSR ¶ 103. He never "needed for anything." PSR ¶ 104. He has a supportive family, who at various times have financially supported him. PSR ¶¶ 105, 106, 147, 149, 151. He has had several well-paying jobs in the tech field, which he has lost for failure to disclose pending

---

[7] "The all-inclusive language of both the Guidelines and 18 U.S.C. § 3661 makes clear that a defendant's arrest record may properly be considered as part of his 'background.'" *United States v. Brown*, 516 F.3d 1047, 1053 (D.C. Cir. 2008).

criminal proceedings and his shoplifting conviction. PSR ¶ 148. Per the PSR, the Defendant uses methamphetamine but has received court-mandated treatment. As the Guidelines notes, "[d]rug or alcohol dependence or abuse ordinarily is not a reason for a downward departure." U.S.S.G. § 5H1.4.

All of the foregoing supports a significant period of incarceration within the applicable Guidelines range.

### D.      Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533. A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121,

1145 (7th Cir. 2013).

### V.   Restitution and Forfeiture

#### A. Restitution

Restitution is mandatory under 18 U.S.C. § 3663A. In his plea agreement, the Defendant acknowledges the Court's obligation to determine mandatory restitution and agreed, apart from that determination, to pay restitution in the amount of $2,385,000. Plea Agreement ¶ 11. In addition to the $2,385,000 – comprised of PPP loans and EIDL funds – the Defendant's conduct caused a loss to the SBA of processing fees paid to the lenders that issued the fraudulent loans. The government requests that the Defendant be ordered to pay restitution in the total amount of **$2,452,050.00**. This restitution should be paid to:

| Victim | Restitution amount |
|---|---|
| SBA | $150,000.00 |
| Newtek Small Business Finance, LLC | $1,120,000.00 |
| SBA *for fraudulent Newtek PPP loan ($1,120,000) processing fees paid by SBA* | $33,600.00 |
| ReadyCap Lending , LLC | $1,115,000.00 |
| SBA *for fraudulent ReadyCap PPP loan ($1,115,000) processing fees paid by SBA* | $33,450.00 |
| **Total:** | **$2,452,050.00** |

#### B. Forfeiture

As part of his plea agreement, the Defendant has agreed to the forfeiture of the seized Tesla Model 3 and 21 bank accounts. *See* ECF 31 (Consent order of Forfeiture). He has also agreed to a forfeiture money judgment in the amount of $2,385,000. *Id.*

As part of his plea agreement, the Defendant also agreed that cryptocurrency purchased using $185,550.49 from PrimeTrust, $92,367.82 from Crypto.com, and $10,779.00 from BlockFi constituted forfeitable proceeds of the wire fraud count. As part of the plea, the Defendant agreed

to liquidate his interest in the cryptocurrency prior to sentencing. Undersigned counsel has been informed by Defense counsel that these funds currently amount to less than $20. In other words, notwithstanding an agreement to liquidate and remit his interest in these fraud proceeds, they appear to be entirely dissipated by the Defendant.

Finally, the government will be moving to forfeit as substitute assets approximately 60 electronic devices, including a server, seized from the Defendant's residence as substitute assets.

## VI.   Conclusion

The Defendant is appearing to be sentenced for an unrelenting fraud scheme designed to defraud critical government programs of more than $31 million ear-marked for the people and businesses suffering the most devastating economic consequences of the COVID-19 pandemic. This fraud is the culmination of years of greed-motivated offenses which continued past indictment and into pre-trial release. The government respectfully submits that a sentence of 168 months of incarceration, three years' supervised release, and restitution and forfeiture as described herein is an appropriate and fair sentence in light of the offense conduct, the need for specific and general deterrence, and the history and characteristics of the Defendant.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
for the District of Columbia
D.C. Bar No. 481052


By:

LESLIE A. GOEMAAT
MA Bar No. 676695
Assistant United States Attorney
U.S. Attorney's Office
601 D St NW, Room 5.1521
Washington, DC 20530
Office: 202-803-1608
Leslie.Goemaat@usdoj.gov